**FIN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **AdvantaClean Systems, LLC**, a North Carolina limited liability company<br><br>     Plaintiff,<br><br>     v.<br><br>**Healthy Indoor Environmental Solutions Incorporated**, a North Carolina Corporation;<br><br>**Thomas Hessler**, a North Carolina citizen; and<br><br>**Nicole Hessler**, a North Carolina citizen,<br><br>     Defendants. | Case No. 3:23-cv-829 |

<u>**COMPLAINT**</u>

Plaintiff AdvantaClean Systems, LLC ("ACS") for its Complaint against Defendants Healthy Indoor Environmental Solutions Incorporated ("HIES"), Thomas Hessler ("Thomas" and with HIES, "Franchisee"), and Nicole Hessler ("Nicole" and, together with Thomas and HIES, "Defendants"), alleges as follows:

**A.    Introduction**

1.     This is an action seeking immediate, preliminary, and permanent injunctive relief to enforce the terms of two Franchise Agreements between ACS and Franchisee (the "Franchise Agreements")[1], and to enjoin Defendants' trademark infringement under the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1051, *et seq.* ACS also seeks to recover the damages it suffered

---

[1] True and correct copies of the Franchise Agreements are attached hereto as "**Exhibit A**."

and continues to suffer as a result of Defendants' breaches of the Franchise Agreements and their associated Personal Guaranty Agreements ("Personal Guaranties").[2] Upon termination, the Franchise Agreements and Personal Guaranties require, among other things, that Defendants: (a) comply with the covenants against competition and solicitation found in the Franchise Agreements; (b) cease using ACS' trademarks; (c) immediately cease using all telephone numbers and listings in connection with the operation of the franchised business and authorize the transfer of the telephone numbers and directory listings to ACS; (d) return all Proprietary Materials and Confidential Information to ACS, including customer lists and data, and permanently cease use of such information and materials; (e) immediately cease using any confidential methods, procedures, and techniques associated with ACS; and (f) immediately cease operating its Office and cease representing itself to the public or holding itself out as a present or former franchisee of the AdvantaClean system. Defendants have failed to perform these obligations.

2.　　　Rather than comply with their obligations under the Franchise Agreements and Personal Guaranties, Defendants are operating a competing restoration and remediation business under the name "Natural Restoration of Raleigh" in North Raleigh and South Durham, North Carolina, using ACS' Confidential Information and trademarks. ACS, therefore, seeks: (a) an immediate and permanent injunction prohibiting Defendants and those acting in concert and participation with them from operating a competing light industrial remediation business in the North Raleigh and South Durham, North Carolina area, in violation of the non-compete and non-solicitation provisions of the Franchise Agreement; (b) an immediate and permanent injunction

---

[2] The Personal Guaranties are attached to the Franchise Agreements as "Exhibit A."

enjoining Defendants' trademark infringement; (c) monetary damages relating to Defendants' unlawful conduct; and (d) an award of attorney fees and costs.

**B.     The Parties**

3.     ACS is a limited liability company organized under the laws of the state of North Carolina with its principal place of business located at 110 N. Freeport Parkway, Coppell, TX 75019. ACS' sole member is Home Franchise Concepts, LLC, a limited liability company organized under the laws of the state of Delaware. Home Franchise Concepts, LLC's sole member is Home Franchise Concepts Parent, LLC, a limited liability company organized under the laws of the state of Delaware. Home Franchise Concepts Parent, LLC's sole member is TCP HFC, Inc., a Delaware corporation with a principal place of business in Irvine, California. ACS is a North Carolina LLC and has a legal existence in good standing in its state of incorporation with the capacity to sue.

4.     Defendant HIES is a corporation organized under the laws of the state of North Carolina with a principal place of business in Raleigh, North Carolina.  HIES may be served with process through its registered agent Nicole Hessler at its registered office at 725 Bennington Drive, Raleigh, North Carolina 27615.

5.     Upon information and belief, Defendant Thomas Hessler is a citizen of the state of North Carolina, and may be served with process at 725 Bennington Drive, Raleigh, North Carolina 27615.

6.     Upon information and belief, Defendant Nicole Hessler is a citizen of the state of North Carolina, and may be served with process at 725 Bennington Drive, Raleigh, North Carolina 27615.

**C.      Jurisdiction and Venue**

7.      This Court has subject matter jurisdiction pursuant to §§ 34(a) and 39 of the Lanham Act, as well as 15 U.S.C. §§ 1116(a), 1121, and 28 U.S.C. §§ 1331, 1332, 1338, and 1367. The action is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00.

8.      This Court has personal jurisdiction over Defendants because they are citizens of North Carolina. Additionally, they entered into contracts with ACS— a limited liability company organized under the laws of the state of North Carolina. Finally, this Court has personal jurisdiction over Defendants because Defendants "expressly agree[d] to the jurisdiction and venue of any court of general jurisdiction in Mecklenburg County, North Carolina and the jurisdiction and venue of the United States District Court for the Western District of North Carolina." Franchise Agreements, § 18.4. Defendants further "irrevocably consent[ed] to the personal jurisdiction of the state and federal courts of North Carolina." *Id.*

**D.      The AdvantaClean System and ACS's Trademarks**

9.      ACS has developed a proprietary system—the AdvantaClean System—for the establishment of a series of standards, specifications, products, marketing, telematics, training, and operations for the successful deployment of restoration and remediation services. Through the execution of franchise agreements, ACS authorizes others to use the AdvantaClean System, including, but not limited to, proprietary information, knowledge and know-how, systems and procedures, personnel policies, customer lists, specifications for vehicles, supplies, equipment and inventory, marketing, accounting, and bookkeeping (collectively, "Confidential Information") to offer and provide restoration and remediation services in residential and commercial properties. AdvantaClean franchisees specialize in offering and selling restoration and remediation services

that make residential and commercial buildings clean, safe, healthy, and energy efficient at various locations within a defined protected territory.

10.     AdvantaClean franchisees enjoy a license from ACS that allows them to use the AdvantaClean trade name and trademarks (the "Marks"), and to benefit from the goodwill associated with such Marks, including the federally registered AdvantaClean® mark, Registration No. 2,767,746, in connection with the operation of their AdvantaClean franchised businesses.

11.     As of December 31, 2022, 142 AdvantaClean franchised outlets exist and operate throughout the United States.

12.     Since their first use in 2003, the AdvantaClean Marks have been used continuously by ACS and its predecessors and affiliates.

13.     The validity of the AdvantaClean Marks, their registration, and ACS's exclusive right to use them in commerce are deemed incontestable under 15 U.S.C. §§ 1065 and 1115(b), as those Marks have been in continuous use in commerce for more than five (5) years and the required affidavit has been filed with the United States Patent and Trademark Office.

14.     ACS and its affiliates have expended a great amount of money, time, and effort in creating, maintaining, improving, advertising, and promoting the AdvantaClean Marks and System throughout the United States, including the state of North Carolina. By virtue of such efforts, the AdvantaClean Marks have become associated in the minds of consumers of commercial and residential restoration and remediation services, and in the mind of the general public, with ACS and ACS alone, and valuable goodwill has been built up in the AdvantaClean Marks.

**E.     The Franchise Agreements and Associated Personal Guaranty Agreements**

15.     Effective May 28, 2019, Thomas agreed to operate, for a period of ten (10) years, an AdvantaClean franchise using the Marks and Confidential Information, within North Raleigh,

North Carolina, and South Durham, North Carolina. *See* Franchise Agreements, § 1.2. Franchisee agreed to provide through its AdvantaClean franchised business "light environmental services in residential and commercial properties that make homes and buildings clean, safe, healthy and energy efficient and include products and services related to: (i) the cleaning, sealing and maintenance of air ducts, dryer vents, coils and ventilation systems (ii) mold remediation, microbial sampling, testing and indoor air quality assessments; (iii) performance of 24 -hour emergency mitigation, cleaning, and restoration services… (v) moisture control, waterproofing, dehumidification, ventilation, and other related products and services; (vi) radon measurement and mitigation; and (vii) other products…" Franchise Agreement § 1.1.

16.     On or about July 1, 2019, ACS, Thomas, and HIES executed two agreements titled: Consent to Transfer and Assumption of Franchise Agreement (the "Assumptions"). True and correct copies of the Assumptions are attached hereto as **Exhibit B**. Pursuant to the express terms of the Assumptions, HIES became the franchisee under the Franchise Agreements in the place of Thomas. *See* Ex. C.

17.     Defendants' AdvantaClean franchised business was located at 725 Bennington Drive, Raleigh, NC 27615 and used the phone number (984) 303-5002.

18.     Pursuant to Section 3.2 of the Franchise Agreements, Franchisee agreed to pay ACS, for the entire term of the Franchise Agreement, a monthly royalty fee equal to the greater of 10% of its gross revenue from the previous month or a minimum royalty fee of $1,000 for the first 12 months of operation and $2,000 thereafter. Franchise Agreements § 3.2.

19.     Pursuant to Section 4.1.5 of the Franchise Agreements, Franchisee acknowledged that's its right to use the Proprietary Marks is derived solely from the Franchise Agreements, and is limited to the conduct of the AdvantaClean franchised business pursuant to and in compliance

with the Franchise Agreements. Franchise Agreements, § 4.1.5; *see also* § 4.1.2. Franchisee further agreed that any unauthorized use of the Proprietary Marks by Franchisee is a breach of the Franchise Agreement and an infringement of the rights of ACS in and to the Marks. *Id.*

20.     Pursuant to Section 15.2.14 of the Franchise Agreements, Franchisee agreed that ACS has the right to terminate the Franchise Agreements immediately, upon notice, without an opportunity to cure, if Franchisee "voluntarily or otherwise abandons the Franchised Business." Franchise Agreements, § 15.2.14.[3]

21.     Pursuant to Section 16 of the Franchise Agreements, Franchisee agreed that, upon termination of the Franchise Agreements, Franchisee would, among other things: (a) discontinue immediately the use of ACS' Proprietary Marks; (b) immediately cease using all telephone numbers and listings in connection with the operation of the franchised business and authorize the transfer of the telephone numbers and directory listings to ACS; (c) return all Proprietary Materials and Confidential Information to ACS, including customer lists and data, and permanently cease use of such information and materials; (d) immediately cease using any confidential methods, procedures, and techniques associated with ACS; (e) immediately vacate the Franchised Business premises; and (f) cease representing itself to the public or holding itself out as a present or former franchisee of the AdvantaClean system. Franchise Agreements § 16.

22.     Pursuant to Section 17 of the Franchise Agreements, Franchisee acknowledged that it would "receive proprietary and Confidential Information and materials, trade secrets, and the unique methods, procedures and techniques which [ACS] has developed." Franchise Agreement §

---

[3] For purposes of Section 15.2.14, the term "abandon" includes "any conduct which indicates a desire or intent to discontinue the franchise[d] business in accordance with the terms of th[e] Agreement for seven (7) days or more without Franchisor's prior written consent." North Raleigh Agreement, § 15.2.14.

17. Therefore, to "protect [ACS] and [ACS'] other franchisees," Franchisee agreed to the covenants not to compete and not to solicit in Section 17 of the Franchise Agreements.

23.     Pursuant to Section 17.2 of the Franchise Agreements, Franchisee agreed that for a period of two (2) years after the termination of the Franchise Agreement, regardless of cause:

> 17.2 . . . neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers, [or] directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:
>
> > 17.2.2 Own, maintain, engage in, be employed as an officer, director, principal . . . or have any interest in any Competitive Business (a) within the Protected Territory, (b) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (c) within a twenty-five (25) mile radius of any AdvantaClean business operated by [ACS] . . .
> >
> > . . .
> >
> > 17.2.3 Solicit any current, former, or prospective customer solicited by [Defendants' franchise] or any other customer of whom [Defendants] ha[ve] become aware as a result of access to [the AdvantaClean System] or other franchisees for any competitive purpose.

Franchise Agreements § 17.2.

24.     Pursuant to Section 17.3 of the Franchise Agreements, Franchisee acknowledged that the noncompete covenants "are necessary to protect the goodwill of the Franchised Business, other AdvantaClean franchisees, and the System…" and that they were "necessary to protect [ACS's] procedures and know-how transmitted during the term of the Agreement." Franchise Agreements § 17.3.

25.     Further pursuant to Section 17.3 of the Franchise Agreements, Franchisee agreed that it is the parties' intent that the provisions of Section 17 be judicially enforced to the fullest extent permissible under applicable law. Franchise Agreements § 17.3.

26.     Further pursuant to Section 17.3 of the Franchise Agreements, Franchisee agreed that in the event of the actual or threatened breach of Section 17 by Franchisee, Franchisee's principals, or any member of the immediate family of Franchisee, ACS "shall be entitled to an injunction restraining such person from any such actual or threatened breach." Franchise Agreements § 17.3.

27.     Further pursuant to Section 17.3 of the Franchise Agreements, Franchisee acknowledged that the covenants in Section 17 are necessary to protect ACS's procedures and know-how transmitted during the term of the Franchise Agreements, and that "in the event of the actual or threatened breach of [] Section 17, [ACS's] harm will be irreparable and that [ACS] has no adequate remedy at law to prevent such harm." Franchise Agreements § 17.3.

28.     Further pursuant to Section 17.3 of the Franchise Agreements, Franchisee agreed that Franchisee and its owners have "previously worked or been gainfully employed in other careers and that the provisions of [] Section 17 in no way prevent any such person from earning a living." Franchise Agreements § 17.3.

29.     Further pursuant to Section 17.3 of the Franchise Agreements, Franchisee agreed that the time limitations in Section 17 "shall be tolled during any default under" Section 17. Franchise Agreements § 17.3.

30.     Pursuant to Section 17.5 of the Franchise Agreements, Franchisee agreed that the "existence of any claim it may have against [ACS], whether or not arising from the Agreement, shall not constitute a defense to [ACS'] enforcement of the covenants contained in [] Section 17." Franchise Agreements § 17.5. Franchisee further agreed "to pay all costs and expenses (including reasonable attorneys' fees) that [ACS] incurs in connection with the enforcement of [] Section 17." *Id.*

31.     Pursuant to Section 16.1.12 of the Franchise Agreements, Franchisee agreed that the covenants set forth in Section 17 of the Franchise Agreements "shall survive the transfer, termination or expiration of this Agreement[.]" Franchise Agreements § 16.1.12.

32.     Pursuant to Section 18.8 of the Franchise Agreements, Franchisee agreed that [n]othing in [the Franchise Agreements] shall prevent [ACS] from seeking to obtain injunctive relief, without posting a bond, against threatened conduct that will cause [ACS] loss or damages…" Franchise Agreements § 18.8.

33.     Pursuant to Section 16.4 of the Franchise Agreements, Franchisee agreed to pay ACS damages, costs, and reasonable attorneys' fees incurred by ACS by virtue of Franchisee's breach of the Franchise Agreements. Franchise Agreements, § 16.4.

34.     In conjunction with the Franchise Agreements, Thomas and Nicole (the "Hesslers") executed the Personal Guaranties pursuant to which they agreed to "unconditionally guarantee the full and timely performance by [Franchisee] of each and every obligation of [Franchisee] under the Agreement or other agreement between [ACS] and [Franchisee]. . .." Franchise Agreements, Ex. A, art. I. The Hesslers also agreed to nearly identical in-term and post-term covenants not to compete in the Personal Guaranties. Franchise Agreements, Ex. A, art. III(1)–(2).

## F.     Defendants Abandon Their AdvantaClean Franchised Businesses and Start a New Competing Business Under the Name "Natural Restoration" and Infringe the AdvantaClean Marks

35.     On October 24, 2022, ACS received a purported Notice of Rescission (the "Notice of Rescission") from Franchisee demanding rescission of the Franchise Agreements between the parties and a return of Franchisee's initial investment costs and all alleged operating losses based on unfounded allegations. A true and correct copy of the Notice of Rescission is attached hereto as **Exhibit C.**

36.     On October 27, 2022, ACS responded to Franchisee's Notice of Rescission (the "October 27 Letter"), denying the allegations, and, among other things, advising Franchisee that there was no basis for rescission of the Franchise Agreements. A true and correct copy of the October 27 Letter is attached hereto as **Exhibit D.**

37.     The October 27 Letter asked Franchisee and its owners to confirm that they would continue operating their AdvantaClean franchised business. *See* Ex. E.

38.     ACS did not receive a response to the October 27 Letter. Additionally, ACS received numerous complaints that Franchisee had not responded to customers and that Franchisee was advising prospective customers that Franchisee was no longer in operation.

39.     As a result, ACS concluded that Franchisee abandoned the AdvantaClean franchised business, and on November 8, 2022, ACS sent Franchisee a Notice of Termination ("Notice of Termination") terminating the Franchise Agreements. A true and correct copy of the Notice of Termination is attached hereto as **Exhibit E**.

40.     Upon termination of the Franchise Agreements, Defendants were required to comply with the post-termination covenants not to compete and other post-termination obligations set forth in the Franchise Agreements.

41.     Recently, ACS discovered that weeks before ACS received the purported Notice of Rescission, Defendants decided to rebrand their AdvantaClean franchised business under the name "Natural Restoration of Raleigh" ("Natural Restoration").

42.     Natural Restoration is "Competitor" as defined in the Franchise Agreements because it derives revenues from the direct or indirect sale of Restoration and Remediation Services, *i.e.*, air duct cleaning, mold remediation, and water damage restoration, among other things. Further, Natural Restoration provides those services to customers in, among other areas,

the Raleigh and Durham markets, which are located within the Protected Territory (as those terms are further defined in the Franchise Agreements).

43. According to public records recently discovered by ACS in its investigation into Defendants' conduct, on or about October 5, 2022, Defendants obtained an Assumed Business Name Certificate (the "Assumed Business Name Certificate") from the Wake County, North Carolina Register of Deed's Office. A true and correct copy of the Assumed Business Name Certificate, which was recorded on October 5, 2022 in Book No. 019166 on Page No. 01996 with the Wake County, North Carolina Register of Deeds Office, is attached hereto as **Exhibit F.**

44. The Assumed Business Name Certificate lists 725 Bennington Drive, Raleigh, NC 27615 as Natural Restoration's principal place of business, the same location as the former AdvantaClean franchised business location which is associated with ACS and its Marks. *See* Ex. F.

45. Additionally, in November 2022, Defendants created a Facebook profile under the name "Natural Restoration of Raleigh" to market Natural Restoration:



46.     According to the Facebook profile, Natural Restoration is using the telephone (984) 303-5002, the same telephone number previously used by Defendants' former AdvantaClean franchised business and associated with the AdvantaClean Marks..

47.     Defendants also launched a website for Natural Restoration on August 19, 2022 at www.raleighrestoration.net:



48.     As shown on the website, Natural Restoration provides services such as mold removal, moisture control, and water damage restoration, and serves, among other areas, the Raleigh and Durham areas.

**EXPERTISE**

Mold Removal · Moisture Control · Water Damage Restoration · Air Duct Cleaning · Dryer Vent Cleaning · Radon mitigation · Dry wall repair · Carpentry · Flooring repair

**SERVING**

Raleigh · Durham · Chapel Hill · Cary · Apex · Holly Springs · Wake Forest · Youngsville and surrounding areas.



**SERVING THE RALEIGH / DURHAM AREA**

49. The website lists the telephone number (984) 303-5002 as the phone number for Natural Restoration, the same telephone number previously used by Defendants' former AdvantaClean franchised business and associated with the AdvantaClean Marks.

50. The website further discloses that the Hesslers are co-owners of Natural Restoration.



**MEET TOM HESSLER**

Tom is co-owner of Natural Restoration with his wife, Nicole. Tom spent more than 25 years in engineering before starting a remediation company and has credentials that anyone in the industry would be hard-pressed to match.

- Bachelor and Master of Science degrees in mechanical engineering
- Extensive experience in research and development and mathematical modeling of fluids and viruses

51. Further, the website *admits* that Natural Restorations is a mere continuation of Defendants' former AdvantaClean franchised business: "I walked away from a successful

corporate career in engineering management and founded my first remediation company in 2019, **which evolved into Natural Restoration**." (emphasis added) (screen shot below).



52.     Additionally, multiple websites associated with Defendants' former AdvantaClean franchise continue to display the AdvantaClean Marks alongside the phone number formerly used by Defendants' former AdvantaClean franchised business, and now used by Defendants' competing business, such as Better Business Bureau and BNI. True and correct copies of screen captures of the foregoing websites are attached hereto as **Exhibit G**.

**G.     ACS Sends Defendants a Cease and Desist Letter, But Defendants Refuse to Comply With Their Post-Termination Covenants Not to Compete and other Post-Termination Obligations**

53.     On October 23, 2023, ACS sent Defendants a cease-and-desist letter (the "Cease and Desist Letter"), which demanded that Defendants immediately comply with their post-termination obligations, including their obligation not to own, maintain, engage in, be employed, or have any interest in any Competitive Business (as defined in the Franchise Agreements and Personal Guaranties) within the Protected Territory and a twenty-five (25) mile radius thereof. A true and correct copy of the Cease and Desist Letter is attached hereto as **Exhibit H**.

54.     Defendants have not ceased operating Natural Restoration, their competing business, and continue to fail to comply with their post-termination obligations in the Franchise Agreements.

## COUNT I
## DECLARATORY JUDGMENT

55.     ACS realleges each of the previous allegations as if fully set forth herein.

56.     The Franchise Agreements are valid, enforceable contracts in writing.

57.     As described above, a dispute exists between the parties as to their rights and obligations under the Franchise Agreements.  In particular, a dispute exists as to whether the Franchise Agreements were properly terminated by ACS as a result of Franchisee's abandonment of the franchise.

58.     This Court has the authority to issue a declaratory judgment on the rights of the parties under the Franchise Agreements pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

59.     The Franchise Agreements each provide a basis for their termination by ACS under specific conditions, including abandonment of the franchises operated under the Franchise Agreements and violation of the covenants not to compete.

60.     Termination for the above-listed reasons can be completed upon notice to Franchisee.

61.     Franchisee abandoned the franchises by ceasing to operate as AdvantaClean franchisees under the Franchise Agreements.

62.     ACS provided Defendants notice of the termination of the Franchise Agreements on November 8, 2022.

63.     Defendants are operating Natural Restoration, which is a "Competitor," and have violated the Franchise Agreements by operating a competing business which violates the covenants not to compete.

64.     ACS requests that the Court declare that Franchisee abandoned the franchise, that ACS properly terminated the Franchise Agreements, and that Defendants violated the covenants not to compete by operating Natural Restoration, which is a "Competitor" pursuant to the Franchise Agreements.

## COUNT II
## BREACH OF FRANCHISE AGREEMENTS AND PERSONAL GUARANTIES
### (FAILURE TO COMPLY WITH POST TERMINATION OBLIGATIONS)

65.     ACS realleges each of the previous allegations as if fully set forth herein.

66.     The Franchise Agreements and Personal Guaranties are lawful and binding contracts.

67.     Defendants have failed to comply with the post-termination obligations set forth in the Franchise Agreements, including by operating a competing business. This conduct constitutes material breaches of the Franchise Agreements and Personal Guaranties.

68.     ACS has no adequate remedy at law to protect its substantial business and property rights at issue in this lawsuit. The damages from Defendants' failure to comply with the post-termination obligations in the Franchise Agreements are considerable and continuing and thus not capable of ascertainment at this time.

69.     ACS is entitled to preliminary and permanent injunctive relief enforcing all post-termination obligations of the Franchise Agreements, preventing Defendants from using ACS' Confidential Information and know-how, using ACS' Marks, and preventing Defendants from operating a competing business in violation of the post-termination non-compete provisions.

70.     As a direct and proximate result of Defendants' actions, ACS has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damages, for breaches of the post-termination obligations, in an amount to be proven at trial, plus costs, disbursements, interests, and attorneys' fees, which in any case exceeds $75,000.

## COUNT III
## TRADEMARK INFRINGEMENT

71.     ACS realleges each of the previous allegations as if fully set forth herein.

72.     ACS has registered certain of its Marks with the United States Patent and Trademark Office.

73.     Since registering its Marks, ACS has extensively advertised its Marks in connection with its products and services.

74.     Defendants do not have any rights to the use of any Mark of ACS.

75.     Defendants continue to unlawfully use and display the ACS Marks in association with the operation of their competing business, Natural Restoration.

76.     Defendants' unauthorized use and display of ACS' Marks constitutes willful and intentional infringement of the Marks in violation of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).

77.     Defendants' acts were done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

78.     Defendants' use in commerce of the ACS Marks without the consent of ACS is likely to confuse or deceive the public into believing, contrary to fact, that the unauthorized activities of Defendants are licensed, franchised, sponsored, authorized, or otherwise approved by or associated with ACS.

79.     ACS has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined, but in any case, exceeds $75,000.00.

80.     ACS has no adequate remedy at law to protect its substantial business and property rights. The damages from Defendants' activities are considerable and continuing and thus not capable of ascertainment at this time.

81.     ACS is entitled to preliminary and permanent injunctive relief preventing Defendants from further infringement of the ACS Marks, plus costs, disbursements, interest and attorneys' fees.

**COUNT IV**
**UNFAIR COMPETITION**

82.     ACS realleges each of the previous allegations as if fully set forth herein.

83.     Defendants have infringed ACS' rights by using and displaying its Marks without authority.

84.     Due to Defendants' infringement and conduct, customers are likely to be confused and induced into patronizing Defendants' competing business in the belief that the goods and services are affiliated, connected, or associated with ACS businesses. Customers have been or are likely to be confused as to the sponsorship of the products and services sold by Defendants while they continue to hold themselves out in a manner similar to that of a franchisee of the AdvantaClean System.

85.     Defendants' actions constitute unfair competition in violation of 15 U.S.C. § 1125(a) and common law.

86.     Defendants' acts were done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

87. ACS has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined but in any case, exceeds $75,000.00.

88. ACS has no adequate remedy at law to protect its substantial business and property rights. The damages from Defendants' activities are considerable and continuing and thus not capable of ascertainment at this time.

89. ACS is entitled to preliminary and permanent injunctive relief preventing Defendants' unfair competition, plus costs, disbursements, interest and attorneys' fees.

## COUNT V
## BREACH OF CONTRACT – FRANCHISE AGREEMENTS
## (FAILURE TO PAY FUTURE FEES AND OTHER AMOUNTS)

90. ACS realleges each of the previous allegations as if fully set forth herein.

91. The Franchise Agreements and Personal Guaranty Agreements are lawful and binding contracts.

92. The Franchise Agreements and Personal Guaranty Agreements required Defendants to pay ACS's royalties and other fees set forth in the Franchise Agreements, for the entire term of the Franchise Agreements.

93. Defendants caused the premature termination of the Franchise Agreements by abandoning their AdvantaClean franchised business.

94. By virtue of Defendants' violations of the Franchise Agreements, ACS sustained a loss of future revenue over the remainder of the term of the Franchise Agreements.

95. ACS has been damaged by Defendants' breach of the obligation to operate their AdvantaClean franchised business pursuant to the Franchise Agreements for the remaining term of the Franchise Agreements.

96.     As a direct result of Defendants' breaches, ACS has been damaged in an amount to be proven at trial – but in no event less than $75,000, plus costs, disbursements, interest, and attorneys' fees.

**COUNT VI**
**ATTORNEYS' FEES**

97.     ACS realleges each of the previous allegations as if fully set forth herein.

98.     Pursuant Section 16.4 of the Franchise Agreements and Article IV, Section 11 of the Personal Guaranties, Defendants agreed to pay ACS for any and all reasonable costs and expenses incurred by ACS in connection with an event of termination and/or the enforcement of ACS's rights.

99.     ACS commenced this action to enforce its rights and the provisions of the Franchise Agreements, due to the termination of the Franchise Agreements resulting from Defendants' actions. ACS is entitled to recover its attorneys' fees and costs in connection with this action, in an amount to be proven at trial, which in any case exceeds $75,000.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff AdvantaClean Systems, LLC, respectfully requests the following relief:

A.      An order declaring Defendants breached the Franchise Agreements and the Franchise Agreements were properly terminated by ACS;

B.      An order for preliminary and permanent injunction directing Defendants, and all others in active concert or participation with them, to immediately cease operating a competing business in violation of the Franchise Agreements;

C.      An order for preliminary and permanent injunction directing Defendants, and all others in active concert or participation with them, to immediately comply with the post-

termination obligations set forth in the Franchise Agreements, including but not limited to the requirement that Defendants cease using ACS' Marks and Confidential Information;

        D.      An order for a preliminary and permanent injunction directing Defendants, and all others in active concert or participation with them, to immediately cease engaging in unfair competition with ACS;

        E.      An award against Defendants, jointly and severally, for the damages ACS has sustained and the profits Defendants have derived as a result of their violations of the Lanham Act, pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117;

        F.      An award against Defendants for treble damages and prejudgment interest in accordance with § 35 of the Lanham Act, 15 U.S.C. § 1117;

        G.      An award against Defendants, jointly and severally, for the damages ACS has sustained and the profits Defendants have derived as a result of their violations of the Franchise Agreements and Personal Guaranties;

        H.      An award against Defendants, jointly and severally, for ACS' damages as a direct and proximate result of Defendants' breach of the Franchise Agreements;

        I.      An award against Defendants, jointly and severally, for ACS's reasonable costs and expenses, including attorneys' fees, incurred in enforcing the provisions of the Franchise Agreements; and

        J.      Such other and further relief as the Court deems just and proper.

Dated: December 4, 2023

PARKER POE ADAMS & BERNSTEIN LLP

By: */s/ Nicholas H. Lee*
Nicholas H. Lee
N.C. Bar No. 47885
620 South Tryon Street
Charlotte, NC 28202
Telephone: (704) 335-9876
Facsimile: (704) 334-4706
NicholasLee@parkerpoe.com

Frank J. Sciremammano*
LATHROP GPM LLP
The Watergate
600 New Hampshire Avenue, N.W. – Suite 700
Washington, D.C. 20037
Telephone: (202) 295-2200
Facsimile: (202) 295-2250
Frank.Sciremammano@lathropgpm.com

*application for admission pro hac vice
forthcoming

*Attorneys for Plaintiff*